Our third case this morning is United States v. Pair, Ms. Arrington-Fisher. Good morning. May it please the court, my name is Miriam Arrington-Fisher. I represent Mr. Pair in this case. Looking back, if there was one word to describe 2020, it's unprecedented. And that was exactly when Mr. Pair found himself awaiting trial in the district court. Mr. Pair was tried and convicted of two counts of distributing fentanyl, and he was sentenced to 144 months. The basic facts of the case as presented at trial involved two controlled buys where the government's witness, an informant, Mr. Newton, in an admitted effort to seek consideration in his own drug distribution case, wore video and audio wire and purchased what he believed to be heroin, which was later determined to be fentanyl, from a person who was alleged to be Mr. Pair. The relevant timeline in the case is that Mr. Pair was indicted on January 21, 2020. He was arrested on January 30, 2020, and he first appeared in the district court on January 31, 2020. His original speedy trial date was calculated for April 10, 2020, and his original trial date was April 6, 2020. The central issue raised in this case that I'm going to devote the majority of my comments on today is the question of whether Mr. Pair's statutory and constitutional rights to a speedy trial were violated, primarily within the context of multiple continuances related to the suspension of jury trials in the Eastern District during the COVID-19 pandemic. Mr. Pair was ultimately tried beginning on March 8th of 2021. As of yet, there is no controlling precedent in this circuit or by the U.S. Supreme Court to definitively answer this question. However, since this case was briefed, several other circuits have ruled on these issues, admittedly in the negative, but I will address today those non-controlling decisions and endeavor to distinguish them. A defendant's right to a speedy trial is derived from both the Constitution and from the Speedy Trial Act. Each has an independent analysis, which was addressed in the District Court and which I will address today. However, as numerous circuits have held, they typically go hand-in-hand. Beginning with the constitutional analysis under the Sixth Amendment, this constitutional right is primarily concerned with safeguarding against excessive pretrial detention. This is an important context because Mr. Pair was detained pending trial, unlike the defendants in some of the adverse decisions in other circuits. I understand that the Barker v. Wingo speedy trial rights and the speedy trial statute are supposed to work in tandem, parallel? A number of courts have made that suggestion. I think that's an accurate, I would agree with Your Honor's position. They do have separate analysis, but I believe one court found that it's very rare, if at all, that one rights are violated and the other are not. They have separate analyses, but they generally go in conjunction. If they are, as many courts have said, if the Barker rights and the Speedy Trial Act are supposed to operate in tandem, one of the Barker factors is whether there was any sort of prejudice to the defense. I didn't see that any witness was lost or mentally impaired, no exculpatory evidence was lost or unavailable. In other words, you had your jury trial, and I didn't see that the delay, part of which was at your insistence, I didn't see that that caused any prejudice. Is that the case in terms of the exculpatory evidence or witness unavailability? On that specific point, no, we did not plead that any witnesses had been lost. Could you speak up again, please? I apologize. No, on that point, Your Honor, we did not plead below that any witness had been lost. Our position on the prejudice to Mr. Payer was, in many ways, prejudice that is likely to occur in lengthy pretrial detention. He was detained for 13 months pending trial, of course, against the backdrop of COVID-19. As we indicated in our brief, he was held at Pamunkey Regional Jail, which had extremely high rates of COVID. They suspended family visitation during that time. There were large periods of time where legal visits were very difficult, and so it was a very challenging time for all of us, but uniquely so for a criminal defendant detained pretrial trying to fight serious criminal charges. Aren't you asking us to apply quite a bit of hindsight? Because if you go into the situation that was affecting the district judges and the circuit, Judge Payne, Judge East, the district, in 2021 or whenever it was, you had a virus that was really literally sweeping the country, causing untold thousands of deaths, and the district judge here didn't want to have on his conscience the jurors or members of the public, witnesses, jurors, or others coming into the courtroom in violation of public health protocols and going out of the courtroom with a case of COVID. And so it seemed to me that safeguarding the parties, lawyers, jurors, witnesses, their health was an important consideration. And it's hard to see how you can fault a district judge for that because he was operating in an environment where the vaccines had not come online and where paracelovid, the antiviral treatment, had not come online. Little, relatively little immunity, relatively little herd immunity had been developed. Well, you say, he could have done it remotely, and then that would have given rise to a second set of claims from the defendant that cross-examination was totally ineffective if it's done remotely. And you could just see those claims come up. So it seems to me a little bit unfair to apply this sort of hindsight to 2020, 2021, when the pandemic had not eased off to the extent that it has today. That's my concern. I know that the federal judiciary nationwide was concerned about people acting in violation of the public health professionals, the FDA and the CDC, and coming out with a ferocious case of COVID, and you would hate to be the cause of even one hospitalization or death. So we have to kind of put ourselves in the place of the district judge at the time the district judge made the decision. Do we not? It's a point well taken, Your Honor, and we're not suggesting that there was callousness below. It was a very difficult time, and I was trial counsel in this case, and I agree that it was challenging to be practicing at that time. I do think respectfully that we have to apply some degree of hindsight because that's where we are. And as far as Mr. Parr's concerns as the defendant in that case, challenging what he perceives to be a constitutional violation, I think that those are not his concerns to balance. Now, they were the district court's concerns to balance. And so I think in response to your question, where that brings me is whether this was in the interest of justice and whether that was necessary. I want to answer the court's question, but I don't want to skip from the Sixth Amendment over to speedy trial. But just because, Your Honor, reference to the Barker v. Wingo test, the district court did make this analysis, and respectfully we disagree with a few points of where the scale fell below on the Barker v. Wingo. The 13-month delay is presumptively long. The reason for delay was largely there were some other issues in the case, but I think the dispositive issue was the series of general orders suspending jury trials. Other circuits have held that that is a neutral delay, which doesn't mean that it doesn't give any weight. It just means that it gets a little less weight than if it had been a delay purely attributable to one side. The district court found that or decided that Mr. Parr did not timely assert his rights, which I think is an important issue that both myself and the government briefed below. I do think it's important to note that Mr. Parr expressed his concerns and frustrations with the delays throughout this process. The first time that he explicitly raised his speedy trial challenge was in the phone conference with Chambers on September 20th of 2021. That was the point at which his third attorney needed to withdraw. Let me ask you a question about the statute here. The statute is expressed in terms of ends of justice. And didn't Congress, when it used that phrase, intend to provide a framework for district judges that was a little bit flexible and not entirely rigid? And if you use the phrase end of justice, it's like the kind of thing you see in statutes like for good cause shown or whatever. And when I see a phrase like for good cause shown or ends of justice, I said, okay, maybe the federal rules or Congress wanted to give the person managing the trial a little bit of flexibility. And to knock this down, what the district court did here seems to me to deprive them of their flexibility. You can't take preventive action when you have a once in a century pandemic. We haven't seen anything like this since 1918 and the flu. And if a public health emergency like this, with the deaths and hospitalizations and everything doesn't allow some kind of postponement, I don't know why we, I don't know whatever would. Your opponent makes the assertion that no court of appeals has reached the contrary conclusion regarding the ends of justice continuances required by the pandemic. And it said that Mr. Payer relied for his position on a district court decision that was overturned by the ninth circuit. And there are no other cases out there saying you can't issue a general order in the face of a major public health emergency.  Yes, your honor. And I will be the first. I would like to acknowledge that my time is over and I'll limit my remarks specifically to answer the court's questions. I agree with that assertion in my research. There is no, no other circuit court holding what we're asking the court to hold today. Now to respond to your honors points about the statute. Yes. The interest of justice exception is codified. And I would agree that district court has to have some level of discretion. Every case is going to be a bit different. The Zedner case does require that the reasons be explained. Up until the very recent decisions arising from the same set of situations in different circuits, again, going back to my original word, it was unprecedented. The best framework that we had up to this point were a series of cases that dealt with natural disasters, Hurricane Katrina, a volcano eruption, a blizzard, the September 11 terrorist attacks. And all of those were very, comparatively very brief periods of time that jury trials were suspended. And so we were not talking about jury trials that were continued for a year. We were talking about a week or two. As the government correctly noted in the 28-J filing, there have been a number of very recent adverse decisions, adverse to our position in other circuits. And so, yes, I do acknowledge that certainly. Without getting too far into the weeds on distinguishing those cases, I do think it's important to note that those cases largely do have a very brief period of time. And as was noted in the Olson case and in the Snyder case, the defendants were not detained pretrial. And some of the other cases that were cited as very recent authority, there were numerous other issues where the defendant had incurred additional excludable time. There was one case where in the Rodriguez-Mendez case, it had already been postponed for up to four years for various defense motions. Isn't it true, though, that there's a, I don't have the exact number, but excludable time based on your clients? I think, was it three attorneys, four attorneys? That would be excludable time. The issue is a little tricky, Your Honor, because the first, I'll say, the three attorney changes occurred during standing order, while standing orders were already in effect. And so we did not dispute that time in the district court in our computation of time, but it's not dispositive. The big ticket item, if you will, are the general orders. There was one, I'll say, attorney-related continuance that we dispute should be excludable time, and that was the September 21 motion to withdraw and motion to continue by Mr. Parr's third attorney, final attorney before me, Ms. Reardon. And in that case, she needed eye surgery. It was an urgent eye surgery. I want to transparently note that the case law, including in this circuit, does say that motions by defense counsel are imputed as motions by the defendant, and so I'm not obscuring that law. However, in this case, I think Ms. Reardon took pains to note on the record that Mr. Parr was not happy with this continuance, that he didn't agree to it, that he didn't want it, and that he was very frustrated by the prolonged delay and the continued delay. And so while I think that's a noteworthy point, and that's why we argued strenuously below that that particular continuance was not attributable to him. The others occurred earlier and were also similarly pandemic-related, while the second one was and occurred during that standing order, while the standing orders were in effect of the period of March to April of 2020. All right, thank you, counsel. You've got some time left for rebuttal. Ms. Pachara, did I pronounce that right? Pachara. Okay, go ahead. May it please the court, Jacqueline Pachara for the United States. Judge Wilkinson, you're correct that the Supreme Court in Zedner recognized that by permitting ends of justice continuances, Congress meant to give district courts flexibility in managing their dockets in criminal cases. Here, the district court properly exercised that authority, recognizing that the need to balance the defendant's right to a speedy trial with his right to a fair trial justified the delays in this case. Judge Wilkinson is also correct that to endorse the defendant's position here and hold that the general orders failed to properly exclude the time from the speedy trial calculations would be creating a circuit split. Thank you. If we were to overturn this, I can't believe the amount of turmoil that this would cause with the district bench. We'd have to decide questions of retroactivity. We'd have to take all of these cases on an individual basis. We'd hear claims about the conditions of prisons and the health conditions of the defendant and conditions in the courtroom and whether the courtroom provided for adequate social distancing and what conditions were put on the trial. It would create a massive disruption just as the pandemic. I don't know whether havoc or chaotic works best. It would be one heck of a situation. We agree, Your Honor. Moreover, the concerns that the chief judge detailed in the general orders were not remote or speculative. They were real and present even in this case. We know that two of the defendant's attorneys conveyed concerns about their ability to consult with the client because of the restrictions of the jails during the pandemic. And the safety of the trial participants was a real concern. We know that my colleague who tried the case had to quarantine for a period and appear remotely at the hearing on the motion to dismiss because she was positive and was symptomatic. And this was during the time where we couldn't immediately test for COVID and confirm whether or not we have it. She had to wait. Jury selection, whether it would be more difficult to get a cross section of the community because you're going to get a lot of the community is going to be hit hard by the pandemic and they're going to seek to be excused and they're going to be other jurors who are going to come in at the last minute. And say, I'm sorry, I've contracted COVID or I checked with my doctor and he doesn't want me or he, she doesn't want me to go into a crowded courtroom in this kind of given this kind of situation. You could be witnesses would ask to be excused or to testify remotely. In other words, it would be quite an undertaking in those early days of the pandemic. And just to start, just for starters, jury selection would be problematic because you'd be asking jurors a lot of times to serve contrary to their individual treating positions advice. And also to guidance from public health organizations, such as the CDC and FDA. And we can say now, oh, you know, we overreacted to the pandemic and there's all this controversy. But at the time we were all just trying to figure it out. Yes, your honor. And I think a key feature about jury service that is distinctive from other activities that people were able to resume is that jury service is compulsory. We know the chief judge was very concerned about requiring people to come into court and to sit there for a multiple day or multiple week trial when they don't have, they don't get to decide when they can leave. They have to be there. Unless the court has other questions as to the statutory analysis, I'm happy to address my friend's points on the sixth amendment claim. My colleague suggested that this case is distinguishable because the defendant was detained pending trial. I will just highlight for the court that so were the defendants in Keith, which is a 10th circuit published decision and Rodriguez Mendez, the third circuit unpublished case. And the courts in both instances, nonetheless found that there was no sixth amendment amendment violation and particularly no showing of prejudice. As judge Wilkinson highlighted, the Supreme court made clear in Barker that the most important part of the prejudice inquiry is the impairment of the defense. The defendant has conceded that he has never alleged that there was a witness or a piece of evidence that went missing due to the delay or that there was any other, you know, a memory lapse or anything like that to show that his defense was somehow impaired. Was there an argument made in those two cases that you cited that the defendant's particular circumstances or susceptibility to COVID or prior health issues warranted a different calculus when it comes to the prejudice inherent in being detained? Not that I'm aware, your honor. I believe that the, it was a generalized assertion. That's what the courts said. This is not a specific allegation of prejudice. It was just sort of the general concern about being detained pretrial in a facility when COVID-19 is present. And I would submit the defendant made no specific allegation that he was more susceptible to COVID. He hasn't even alleged that he contracted COVID during this period. So his claim is sufficiently, I'm sorry, similarly generalized and that's simply not enough to establish prejudice, even under this court's precedent. Unless the court has further questions, we ask that you affirm. Thank you very much. Ms. Arrington Fisher, you've got some time left for rebuttal. Thank you. Just a few points to make, your honors. My colleague used the term docket management or docket control,  and I do want to note that the Speedy Trial Act specifically finds that docket control is not a valid reason for an ends of justice exception. And that is codified at the U.S. Code section 3161H8B and C. But I think, I mean, I hope you would agree that that's provision at least, even if it doesn't say so expressly, is not meant to be a catch-all for each and every circumstance that might arise. And in particular here, it's just not about docket control. It is, I guess, in the abstract, but it's docket control as Judge Wilkinson pointed out in the context of a pandemic. And you would agree, I hope, that that's different, right? I do, your honor. Central to our position is that, is an acknowledgement necessarily that this was unprecedented, but along those same lines, what the district court's responsibility was to figure out how to resume operations. And we're not suggesting that they were callous about that, but it is, I think, important to note that we can look no further than the actual trial itself, which began on March 8th of 2021. That was still during the pandemic. There were additional waves of COVID during that time. Ms. Emerson, the U.S. attorney contracted COVID somewhere in there and was quarantined. It was certainly an ongoing issue that we continue to deal with. But by that point, the district court had put procedures in place to resume jury trials during that time. Okay. So again, correct me if I'm wrong, but are you suggesting that that could have been done sooner? What's the evidence to support that? I mean, these things take time, right? You have to sort of work your way through slowly and figure out in the context of a pandemic that we had not seen in ages and try to figure out what the best protocols would be that would balance the important rights of defendants like your client against the participants in the trial. And you just can't do that, you know, haphazardly. That takes some time. I think that's a point well taken, Your Honor, that it's not something that could be done overnight. But in looking at what was ultimately implemented, you know, jury questionnaires, enlarging the pool to account for, you know, people not being able to serve, the plexiglass panels, the masking, the courtroom being spaced out. As counsel noted, there was at least one hearing where there was remote testimony. So I guess in a sense that is part of my argument, that those measures should have been taken up sooner. And I want to close before my time runs out with addressing your point, Judge Wilkinson, which was essentially asking whether this would open up a Pandora's box. And I think that while that is an understandable concern and that there's, you know, a need for judicial order and efficiency, I respectfully don't think that that would be the case here. This is a finite period of time, and there was a finite number of jury trials that were impacted. My recollection is that Mr. Pair was the second jury trial that was scheduled after the resumption of jury trials beyond the speedy trial date. And I'm not aware, at least at the time that we raised this issue, he was the first defendant in the Eastern District in Richmond to do so. So while it's arguable that other people were impacted during that time, I think it's a finite number. And so in the balancing of scales, I would respond to the court's concern in that way. Thank you. Thank you very much. Ms. Arrington-Fisher, I note that you two are court appointed. Thank you for taking on this case and for your able representation of your client this morning. We truly appreciate your efforts. So thank you very much. We'll come down and greet counsel and then proceed to our final case.
judges: Albert Diaz, J. Harvie Wilkinson III, DeAndrea Gist Benjamin